NOTICE
Decision filed 06/03/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 240045-U

NO. 5-24-0045

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* RIVER B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22-JA-147 |
| | ) | |
| Timothy B., | ) | Honorable |
| | ) | Phoebe S. Bowers, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Presiding Justice Vaughan and Justice Welch concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Where the trial court's orders finding that Timothy B. was an unfit parent and that the best interest of the minor child warranted termination of his parental rights were not contrary to the manifest weight of the evidence, we affirm the orders.

¶ 2    Timothy B. (Timothy) is the father of a baby girl, River B. (R.B.). The involvement of the

Department of Children and Family Services (DCFS)[1] began immediately after her birth.

_____

[1]The Center for Youth & Family Solutions is the local agency utilized by DCFS in this case. Although the two entities are not interchangeable, for ease of understanding, we will refer to both entities as DCFS.

¶ 3                              I. BACKGROUND

¶ 4     R.B. was born on July 7, 2022, in a Decatur area hospital. Her mother is Andrea P. (Andrea) and her father is Timothy. This appeal only addresses the termination of Timothy's parental rights. Andrea is not part of this appeal.

¶ 5     Upon R.B.'s birth, Andrea tested positive for methamphetamine. R.B.'s cord blood was sent off for testing, and ultimately tested positive for norbuprenophine, fentanyl, morphine, amphetamines, benzoylecgonine, cocaine, and methamphetamine. A hotline reporter informed DCFS that both Andrea and Timothy had substance abuse issues and prior DCFS involvement. In addition, Timothy had a history of domestic violence involving Andrea.

¶ 6     DCFS assigned an investigative caseworker to go to the hospital after R.B.'s birth. The caseworker spoke with both parents. Both admitted to opiate and heroin use in the past two weeks. Timothy advised that he was then in outpatient substance abuse treatment at Heritage Behavioral Health. Both Andrea and Timothy reported that they were homeless. DCFS took R.B. into protective custody.

¶ 7     On July 14, 2022, the State filed its three-count petition alleging that R.B. was neglected and abused. The State alleged that R.B. was (1) neglected because the environment was injurious to her health because the parents had domestic violence and substance abuse issues and because R.B.'s system contained multiple drugs of abuse at birth (705 ILCS 405/2-3(1)(b) (West 2022)); (2) neglected because her blood at birth contained controlled substances, and because her parents had issues with domestic violence and substance abuse (*id.* § 2-3(1)(c)); and (3) abused because the people responsible for her welfare created a substantial risk of physical injury other than accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function because of the domestic violence

2

and substance abuse issues in the home (*id.* § 2-3(2)(ii)). The State asked the trial court to declare R.B. a ward of the court.

¶ 8    On July 15, 2022, the trial court entered its temporary custody order finding probable cause for the filing of the petition because of the history of substance abuse and domestic violence between the parents, prior DCFS involvement, R.B.'s positive drug test results at birth, and because Andrea had previously surrendered her parental rights to three other children. The court awarded temporary custody of R.B. to DCFS.

¶ 9    The trial court held its adjudicatory hearing on September 7, 2022. The parents stipulated to count I, count II was dismissed, and the court made no reference to count III. In its written order dated September 15, 2022, the trial court indicated that R.B. was "abused, neglected as defined by 705 ILCS 405/2-3," but did not select a statutory subcategory. The court indicated that its finding was based on the following facts: "domestic violence; substance abuse; child born [positive] for numerous drugs." The court also stated that the allegations of the petition were proved by a preponderance of the evidence/stipulation.

¶ 10    On September 14, 2022, DCFS filed its dispositional hearing report with the trial court. DCFS indicated that Timothy had three criminal convictions for assault. DCFS had not yet conducted the integrated assessment with Timothy. R.B. was in a relative foster placement and had adjusted well. DCFS listed Timothy's goals as participation in services for domestic violence as the perpetrator, substance abuse treatment, mental health counseling, and parenting classes. In addition, Timothy was required to cooperate with DCFS and obtain employment and housing. Timothy was exercising visitation with R.B. four times per week in the home of the relative foster parent. DCFS received no negative reports about these visits. The caseworker had observed a few visits and noted that Timothy was an active participant in caring for R.B. DCFS reported that

3

Timothy was actively engaged in counseling and substance abuse treatment. DCFS noted that he was not reliable in answering his phone and had missed a few appointments due to transportation issues.

¶ 11    DCFS filed its first family service plan with the court on September 19, 2022. The start date of the plan was July 13, 2022, with a target completion date of January 31, 2023. Timothy's action steps mirrored the goals referenced by DCFS in its dispositional hearing report.

¶ 12    On September 28, 2022, the trial court held the dispositional hearing. The court's September 29, 2022, written order found that it was consistent with the health, welfare, safety, and best interest of R.B. to be made a ward of the court. The court found that for reasons other than just financial circumstances, Timothy was unfit and unable to care for, protect, train, educate, supervise, or discipline R.B. and placement with Timothy was contrary to R.B.'s health, safety, and best interest because of Timothy's issues with domestic violence and substance abuse. The court placed custody and guardianship of R.B. with DCFS.

¶ 13    On March 10, 2023, DCFS filed its permanency report with the trial court. As of that date, DCFS reported that Timothy had not made satisfactory progress nor reasonable efforts in working towards the goal of returning R.B. home within 12 months. DCFS noted that Timothy was incarcerated in the De Witt County jail from November 2022 through January 2023, and then again in late February 2023. He had not made progress on his substance abuse tasks, although he was receiving services from a methadone clinic. However, he had not requested an increase in the dosage he was receiving and admitted to also using heroin. Timothy's substance abuse counselor was supposed to "send over drug screens" to DCFS but had not done so. Upon discharge from jail, Timothy did not reengage with the methadone clinic, stating he feared that participation would result in his continued use of heroin. DCFS set Timothy up for random drug tests beginning in

January 2023, but he failed to appear for any of the tests. He had been given one random oral drug screen in January 2023 that was positive for amphetamines, methamphetamine, and marijuana. Timothy participated in some individual mental health sessions but did not attend any of the recommended group sessions. He was not able to participate in mental health services while he was incarcerated, and during the period in January after he was released from jail, he did not engage in any mental health services. At the start of this case, Timothy was referred for parenting classes, but he missed the deadline to enroll. He began parenting classes in January 2023, but had not completed the classes by the date of this report. Timothy had not obtained housing or employment. His cooperation was described as inconsistent because of his incarceration. Finally, Timothy was referred for domestic violence services, but he had not engaged in those services. Timothy was allowed six supervised hours of visitation with R.B. per week. When he was able to engage in visits, Timothy was described by caseworkers as being an active participant. DCFS suggested that the permanency goal remain to return R.B. home within 12 months.

¶ 14    On March 10, 2023, DCFS filed its next family service plan with the trial court. The plan date began on January 10, 2023. DCFS rated Timothy's progress since the September 2022 service plan (from July 13, 2022, to January 31, 2023) as unsatisfactory on the following service plan objectives: services for substance abuse, mental health, and domestic violence, and in obtaining housing and employment.

¶ 15    The trial court held a permanency hearing on March 22, 2023, after which the court retained the permanency goal to return R.B. home within 12 months. The court found that Timothy had not made reasonable and substantial progress or reasonable efforts toward this goal. Custody and guardianship of R.B. was maintained with DCFS.

¶ 16    On August 17, 2023, DCFS filed its next permanency report with the trial court. DCFS indicated that Timothy had not made reasonable progress or efforts toward the goal. As of the date of the report, Timothy was now in an Illinois Department of Corrections prison. Due to being incarcerated since the last permanency hearing, Timothy had made no progress on any of his service plan objectives. His projected release date was July 2025. DCFS indicated that the case met the criteria for a legal screening.

¶ 17    On August 30, 2023, the State filed its motion seeking to terminate Timothy's parental rights. As of that date, Timothy was in the Jacksonville Correctional Center—Pittsfield Work Camp. The State listed the following four grounds for unfitness: (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to R.B.'s welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) failed to make reasonable efforts to correct the conditions that were the basis for R.B.'s removal from Timothy during any nine-month period following the adjudication of neglect and/or abuse (*id.* § 1(D)(m)(i)); (3) failed to make reasonable progress toward the return of R.B. during the nine-month period following the adjudication of neglect and abuse from September 15, 2022, through June 15, 2023 (*id.* § 1(D)(m)(ii)); and (4) failed to make reasonable progress toward the return of R.B. during the nine-month period following the adjudication of neglect and abuse from December 1, 2022, through September 1, 2023 (*id.*).

¶ 18    On August 31, 2023, DCFS filed an addendum to its August 17, 2023, permanency report. DCFS reported that the case had passed legal screening on August 29, 2023. The caseworker met with Timothy at prison on August 29, 2023. Timothy reported that he was in anger management classes as well as a class called "Inside Out Dads."

¶ 19    On September 6, 2023, the trial court held a permanency hearing, and over Timothy's objection, entered its order finding that the appropriate permanency goal was substitute care pending the court's determination on termination of parental rights.

¶ 20    The trial court held the fitness hearing on November 16, 2023. The State called one witness, and Timothy testified on his own behalf.

¶ 21    The State called Whitney Boughan, a caseworker for the Center for Youth & Family Solutions. She testified that she became R.B.'s caseworker in August 2023, but she was the caseworker for some of R.B.'s half-siblings, and so she was familiar with the family, and had otherwise reviewed the previous caseworker's notes and the file to familiarize herself with the case. Boughan testified that at the beginning of the case, Timothy was supposed to cooperate with the agency, engage in services for parenting, substance abuse, mental health, and domestic violence, and obtain employment and suitable housing. At the beginning of the case, Timothy was engaged in a methadone program. He then went to jail, and upon release, he did not submit to required random drug tests. She confirmed that in January 2023 there was one positive oral drug test for amphetamines, methamphetamine, and marijuana. Boughan confirmed that in between Timothy's incarcerations, he did not participate in any services. She stated that he had signed up for parenting classes in January 2023, but because he was in jail later that month, he was unable to participate. Boughan concluded her testimony by saying that given the lack of services completed, it would be a long time before R.B. could be returned home to Timothy. The trial court asked Boughan about Timothy's cooperation with the agency. She testified that he had always been cooperative during her tenure on the case.

¶ 22    Timothy testified that he entered the Illinois Department of Corrections in May 2023. He testified that he came close to completing his parenting classes before May 2023. Up until January

7

2023, he had also been in substance abuse treatment and had engaged in individual counseling. DCFS referred him for domestic violence services, and he had been in the process of enrolling prior to going to prison. Timothy testified that he had been unable to complete any services in prison. He stated that he believed he could be paroled as soon as December 2023, and he had employment possibilities, but nothing official. Timothy indicated that he was willing to finish all required services upon being paroled. Before he was incarcerated, Timothy said that he had weekly visits with R.B., and that the visits went well.

¶ 23    On cross-examination, Timothy confirmed that he had been referred for parenting classes in 2022 but missed the sign-up cutoff date. After being released from the De Witt County jail in January 2023, he signed up for parenting classes and completed 9 of the 10 sessions before he went to prison. He also said that he completed one-half of his domestic violence application. Timothy stated that he been doing weekly mental health sessions at Heritage, which was part of the substance abuse program. However, he was not participating in the group sessions. Transportation remained a barrier for increased participation.

¶ 24    The trial court asked Timothy what charges led to his imprisonment. Timothy testified that his parole for a domestic battery charge was revoked because he did not submit to a drug test and missed three meetings with his parole officer. He confirmed that he was in the De Witt County jail in November and December of 2022, and then for about one week in February 2023. The last time Timothy saw R.B. was one week before he was incarcerated at the Jacksonville Correctional Center. He testified that he sent her letters during his incarceration.

¶ 25    The trial court summarized the evidence and concluded that the State had amply established by clear and convincing evidence that Timothy had not made reasonable efforts during any nine-month period or reasonable progress during the two specified nine-month periods. The court noted

8

that Timothy had not even begun domestic violence services, and there was no evidence that upon parole from prison, he would have employment and/or housing. Overall, the trial court stated that Timothy showed a lack of consistency because of the periods of incarceration. The court concluded that the State had not established that Timothy failed to show interest or concern as to R.B.'s welfare. However, the court found that the State established that Timothy did not exhibit responsibility[2] towards R.B.'s health and welfare, stating: "He's not been able to stay out of custody enough to get services done to be responsible for his child." The court found that Timothy was an unfit person.

¶ 26     On December 7, 2023, the trial court held the best-interest hearing. Andrea surrendered her parental rights on that date. During the hearing, the State called caseworker Whitney Boughan. Timothy testified on his own behalf.

¶ 27     Boughan testified that R.B. was thriving and was bonded with her foster father who was her maternal grandfather. R.B.'s three half-siblings who were 15, 8, and 6 years old were also in the home. She stated that R.B. was involved with extended relatives, attended sporting events in which her older siblings participated, and dined out with her family at a local diner. The grandfather was physically and financially able to care for R.B. Boughan stated that this was an adoptive placement. R.B. was placed with her grandfather about one week after she was born, and she had known no other home. She believed that there was no issue with Timothy being able to communicate with R.B. if Timothy's parental rights were terminated. Boughan testified that she believed that termination of Timothy's parental rights was in R.B.'s best interest.

_____

[2]The written fitness order differed from the oral order on the record at the conclusion of the hearing. The written order indicated that the State established that Timothy failed to maintain a reasonable degree of interest, concern, or responsibility for R.B.'s welfare. In a situation where the oral and written orders are in conflict, the oral ruling is considered the judgment of the trial court. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 87; *People v. Roberson*, 401 Ill. App. 3d 758, 774 (2010). The written order is merely evidence of the oral judgment. *Roberson*, 401 Ill. App. 3d at 774.

¶ 28    Timothy also testified at the best-interest hearing. He stated that his projected parole date was in May 2024, but that he was participating in a program that could move his parole date up to March 2024. Upon parole he would live with his sister in the same town where R.B. currently lives. He also had lined up a tile setting job to start upon his parole from prison. He testified that he did not believe it would be in R.B.'s best interest to terminate his parental rights. The trial court asked Timothy about his other three children. Timothy testified that his oldest was living on her own in Kentucky. His younger children are six and nine and live in Bloomington with their mother. Three years earlier, the two youngest children lived with him. Timothy testified that he supported them when they lived with them. He has an upcoming court date in March 2024 about child support for those two children.

¶ 29    The court concluded that it was best for R.B. to remain in her current home. She was bonded with her grandfather and her siblings, and all needs were being met. R.B. had never known another home. As she was only then 17 months of age, the court discounted the likelihood that she had a bond with Timothy, stating that he had been incarcerated most of her life. The court noted that R.B. felt love and a sense of attachment to that household and remaining in her grandfather's care would be the least disruptive placement for her. Finding that R.B. deserved permanence, the court found that the State had established by a preponderance of the evidence that it was in R.B.'s best interest to terminate Timothy's parental rights.

¶ 30                                II. ANALYSIS

¶ 31    Timothy appeals the trial court's orders finding that he was an unfit person and terminating his parental rights.

¶ 32    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)) provide the legal authority for the involuntary

10

termination of parental rights in Illinois. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d 329, 337 (2010)). Section 2-29 of the Juvenile Court Act of 1987 provides the procedural basis for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2022). The process mandated involves two hearings. In the first hearing, the State must prove by clear and convincing evidence that the parent is an "unfit person" as defined by the Adoption Act. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994)); 750 ILCS 50/1(D) (West 2022). If the trial court finds that the parent is unfit, the case proceeds to a second hearing where the State must prove, by a preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d at 337-38); 705 ILCS 405/2-29(2) (West 2022).

¶ 33    When a parent appeals the trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the appellate court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re A.W.*, 231 Ill. 2d 92, 104 (2008)). The reviewing court gives great deference to the trial court's finding of unfitness because the court had the best opportunity to view and evaluate the parties and their testimony. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)). Therefore, we do not reweigh the evidence or reassess the credibility of the witnesses on appeal. *Id.* (citing *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001)). "A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.* (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

11

¶ 34                                          A. Fitness

¶ 35    We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Timothy was an "unfit person." The trial court determined that the State met its burden of proof on the following bases: (1) Timothy failed to maintain a reasonable degree of responsibility as to R.B.'s welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) Timothy failed to make reasonable efforts to correct the conditions that were the basis for R.B.'s removal during any nine-month period after the adjudication of neglect (*id.* § 1(D)(m)(i)); and (3) Timothy failed to make reasonable progress toward R.B.'s return within two specific nine-month periods following the adjudication of neglect (*id.* § 1(D)(m)(ii)).

¶ 36                          1. *Reasonable Degree of Responsibility*

¶ 37    The language used by our legislature in section 1(D)(b) of the Adoption Act is in the disjunctive, meaning that any one of the three separate segments—interest or concern or responsibility—"may be considered by itself as a basis for unfitness." *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31 (citing 750 ILCS 50/1(D)(b) (West 2012); *In re Richard H.*, 376 Ill. App. 3d 162, 166 (2007)). To determine if a parent has shown a reasonable degree of interest, concern, or responsibility for a minor's welfare, the court "considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare." *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). The court can also consider evidence that the parent completed his or his service plan as establishing the parent's interest, concern, or responsibility. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1065). A parent's effort is more important than a parent's success with the service plan objectives. *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990)). The court must "examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d

12

at 278). Circumstances of the parent's difficulties in completion of plan objectives and/or in attending visitation, including transportation issues and poverty, are relevant in assessing the reasonable degree of a parent's interest, concern, or responsibility for the minor's welfare. *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d at 278-79). "We are mindful, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child." *Id.* (citing *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)). Instead, the court must objectively assess whether the interest, concern, or responsibility is reasonable. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064).

¶ 38 Here, the trial court concluded that Timothy failed to show responsibility toward R.B.'s return. We turn to the service plan objectives and visitation to assist in evaluating whether the trial court's conclusion was in error. *In re Richard H.*, 376 Ill. App. 3d at 166.

¶ 39 Timothy never completed any of his service plan objectives: services for substance abuse, mental health, domestic violence, parenting, and obtaining employment and housing. When he was not incarcerated in the De Witt County jail or in the Jacksonville Correctional Center, he missed several required drug tests.

¶ 40 We must give great deference to the trial court's finding of unfitness as the court was able to evaluate the demeanor and testimony of Timothy and caseworker Boughan. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). We agree with the trial court's findings that the evidence clearly established that Timothy failed to maintain a reasonable degree of responsibility for R.B. Timothy's failure to engage or complete the required service plan objectives demonstrated his lack of responsibility for R.B. *In re Daphnie E.*, 368 Ill. App. 3d at 1065. Moreover, we agree with the trial court's assessment that because Timothy was incarcerated for most of R.B.'s life, his inability to complete any services reflects a lack of

13

responsibility for R.B. We conclude that the trial court's finding is not contrary to the manifest weight of the evidence. *In re M.I.*, 2016 IL 120232, ¶ 21; *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re A.W.*, 231 Ill. 2d at 104).

¶ 41                    2. *Reasonable Effort Within Any Nine-Month Period*

¶ 42    "Reasonable effort" is determined by a subjective standard that refers to the amount of effort which is reasonable for that parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1066-67. The court must determine whether the parent has made committed and diligent efforts toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. "A parent's deficiencies collateral to the conditions that were the basis for the removal of the children are not relevant to the reasonable efforts analysis." *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002).

¶ 43    Timothy argues that the trial court's finding that he was unfit for failure to make reasonable efforts to correct the conditions that brought R.B. into DCFS custody was contrary to the manifest weight of the evidence. DCFS removed R.B. from Timothy's care because of a home environment that was potentially injurious to her health in that Timothy had ongoing substance abuse and domestic violence issues. Timothy did not complete any service plan objectives, and thus did not make "a committed and diligent effort" to correct the underlying conditions. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. We find that the trial court's order finding that Timothy failed to show a reasonable effort toward correcting these conditions is not contrary to the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

14

¶ 44          3. *Reasonable Progress Within Two Nine-Month Periods*

¶ 45      The term "reasonable progress" requires an objective determination regarding the amount of progress based upon the conditions existing at the time the minor child's custody was removed from the parent. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47 (citing *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

> " 'The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent.' " *Id.* (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

"A parent makes reasonable progress when the trial court can find that the progress 'is sufficiently demonstrable and of such a quality' that the trial court may soon be able to order the return of the minor to the parent's custody." *Id.* (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

¶ 46      Here, the trial court found that Timothy failed to make reasonable progress during two specific nine-month periods following the court's adjudication of neglect: from September 15, 2022, through June 15, 2023, and from December 1, 2022, through September 1, 2023. During the 17 months that Timothy's DCFS case was open, he failed to complete his substance abuse, mental health, domestic violence, and parenting service plan objectives. In addition, Timothy never obtained employment or housing. He did not appear for several required drug tests and tested positive for amphetamines, methamphetamine, and marijuana on the one drug test he completed in January 2023.

¶ 47      Timothy's incarceration does not constitute evidence of a failure to make reasonable progress. *In re J.R.Y.*, 157 Ill. App. 3d 396, 403 (1987); *In re D.D.*, 309 Ill. App. 3d 581, 589

15

(2000). However, the period of incarceration may be included in the nine-month periods during which the parent is required to make reasonable progress on service plan objectives. *In re J.L.*, 236 Ill. 2d at 343. R.B. was removed from Timothy's care in early July 2022. From July 2022 until his incarceration in November and December 2022, he completed no services. He was in the county jail again in February 2023. In May 2023, through the date of the fitness hearing, Timothy was incarcerated in the Jacksonville Correctional Center. Thus, Timothy was incarcerated for portions of the two nine-month periods. We are cognizant that Timothy's ability to complete the required programs and obtain employment and housing was thwarted because of his incarceration. However, he was incarcerated because he chose not to comply with the terms of his probation. Timothy failed to complete even one service plan objective before or during his incarceration. We agree with the trial court's finding that Timothy objectively failed to make reasonable progress to correct the conditions that were the basis for the removal of R.B. during these two nine-month periods.

¶ 48 We conclude that the trial court's order finding that Timothy was an unfit person is not contrary to the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re A.J.*, 269 Ill. App. 3d at 828).

¶ 49                                B. Best Interest

¶ 50 Termination of a parent's rights is a difficult and final step. *In re Adoption of Syck*, 138 Ill. 2d at 274-75. Parents maintain the important right to raise their own children. *Id.* However, when a parent has been declared "unfit," "the parent's rights must yield to the child's best interest." *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*, 236 Ill. 2d at 337-38. The interests of the parent and the child remain concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship' " until the court declares that the

16

parent is unfit. *In re D.T.*, 212 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982)).

¶ 51    At the best-interest hearing, the State must establish proof that termination of a parent's rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2) (West 2022); *In re D.T.*, 212 Ill. 2d at 366. We review the trial court's best-interest decision with the manifest weight of the evidence standard. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009); *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006). A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072. On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court was in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000).

¶ 52    "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court must analyze several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2022). Those factors include:

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and religious;
>
> (d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.*

The trial court is not required to make an explicit finding on each of the best-interest factors. *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 33 (citing *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19); *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43 (citing *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991)). Another factor the trial court may consider is the likelihood of adoption. *In re Tashika F.*, 333 Ill. App. 3d at 170.

¶ 53    During the best-interest hearing, caseworker Boughan testified that R.B. had all her needs met in her grandfather's home. She had never lived in any other home, was bonded to her grandfather and siblings, and engaged in activities in the community and with her family. Boughan

18

had no concerns about this placement, noting that this was an adoptive placement, and that Timothy was welcome to have continued communications with R.B. during his incarceration.

¶ 54    Here, the record clearly establishes that termination of Timothy's parental rights was the appropriate outcome for R.B. under all the circumstances. We conclude that the trial court's decision to terminate Timothy's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 55                                    III. CONCLUSION

¶ 56    For the foregoing reasons, we affirm the judgments of the circuit court of Macon County finding that Timothy was an unfit parent, and that the best interest of R.B. required the termination of his parental rights.


¶ 57    Affirmed.